# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

STEVEN M. COPELAND,               )
                                  )
Plaintiff,                        )
                                  )
    vs.                           )     No. 2:11-CV-363
                                  )
MICHAEL J. ASTRUE,                )
COMMISSIONER OF                   )
SOCIAL SECURITY,                  )
                                  )
          Defendant,              )

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits to Plaintiff, Steven M. Copeland. For the reasons set forth below, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

BACKGROUND

On March 22, 2007, Plaintiff, Steven M. Copeland ("Copeland"), applied for Social Security Disability Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401 *et seq.*, and Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. section 1383 *et seq.* Copeland alleged that

his disability began on August 1, 2002, due to mental impairments. The Social Security Administration denied his initial application and also denied his claim on reconsideration. On April 16, 2010, Plaintiff appeared via video teleconference, represented by counsel, at an administrative hearing before Administrative Law Judge ("ALJ") Sherry Thompson. Testimony was provided by Copeland and Thomas Gresik, a vocational expert. On June 3, 2010, ALJ Thompson issued a decision denying Copeland's claims, and finding him not disabled because he did not have a listing-level impairment or combination of impairments and he retained the functional capacity to perform his past relevant work and a significant number of other jobs despite his functional limitations.

Plaintiff requested that the Appeals Council review the ALJ's decision, but the request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a). Plaintiff has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).

DISCUSSION

Facts

Copeland was born on May 25, 1969, and was 41 at the time of the ALJ's decision. (Tr. 130, 35.) Copeland finished tenth grade, and has a high school equivalency diploma (GED). His past relevant

work includes heavy construction labor (Tr. 52), although Copeland also testified in the hearing that he had done landscaping (Tr. 37).

<u>Medical Evidence</u>

In June of 2002, Copeland was admitted into a hospital "in relation to drug overdose with analgesics," complaining of depression and anxiety, after a suicide attempt. (Tr. 254.) Copeland had injured his left foot in a work related accident in September of 2001, and reported being depressed since his injury. *Id.* Under the "past history," section of his chart, the hospital staff indicated that Copeland "had a fracture of his spine ten years ago and he has back pain. He had no surgery for same." (Tr. 254.) Additionally, he was feeling hopeless, was suffering from chronic depression, was abusing alcohol, had tested positive for cocaine and marijuana, and reported hearing "some voices sometimes." (Tr. 256-57.)

In June 2007, at the request of the agency, Plaintiff was examined by Dr. Jeffrey Karr, and Dr. Karr reviewed the adult disability report alleging bipolar disorder, schizophrenia, and a personality disorder. (Tr. 391.) At the time of the exam, Copeland was not using medication, but he reported foot and back pain, alcohol and substance abuse, multiple treatment programs, two incarcerations, and that "people make me mad." (Tr. 392.) Copeland was working full time at a landscaping agency, but thought

he would be fired soon due to ongoing conflict with his coworkers. (Tr. 392.) Dr. Karr observed that Copeland presented as "mildly agitated, rather edgy, seemingly disgusted, and on occasion briefly tearful. . . egocentric, outspoken, particularly voicing repetitive themes of dislike and mistrust of people . . . [but] he did not exhibit bizarre behaviors." (Tr. 393.)

Following Dr. Karr's examination, two state agency psychologists reviewed the record and assessed Copeland's mental functional capacity. (Tr. 404-20, 423.) They found Copeland suffered from bipolar disorder, personality disorder, and polysubstance abuse history, but that he had a "mild" degree of restrictions of activities of daily living. (Tr. 404-14, 423.) Additionally, according to his fiancé, Copeland had been sober for 90 days, and was "doing a good job at the sober living facility [where he was housed at the time], where they [were] considering him for assistant house manager position." (Tr. 420.) She also reported that he was delivering meals to the elderly and participated in house activities. *Id.* Copeland did "have a short fuse," and had depressed periods every 45 days, lasting about 4-5 days. *Id.* The state agency psychologists found that Copeland "remains capable of performing work related activities and would do best in an environment that is not highly social." (Tr. 420.)

Copeland then had a physical exam at the request of the agency, conducted by Dr. Saavedra. (Tr. 398-402.) Copeland

complained of anger issues, suicidal thoughts, hearing voices, and numbness and pain in his left foot. (Tr. 398.) Dr. Saavedra found that there was no clinical evidence to support Copeland's complaint of back pain or reflex sympathetic dystrophy in his foot, but he was suffering from schizophrenia, migraines, and bipolar disorder. (Tr. 401.) Two state agency physicians then reviewed the evidence, and found that Copeland did not have a "severe" physical impairment that significantly limited his ability to perform work-related activities. (Tr. 422, 424.)

Copeland began seeing Dr. Steven M. Robbins, a psychiatrist and his treating therapist, in August 2007. (Tr. 703-04.) Copeland told Dr. Robbins that he was having suicidal ideation everyday. (Tr. 703.) However, he denied manic symptoms or racing thoughts, and he was alert and oriented, in no acute distress (Tr. 703-04.) Dr. Robbins prescribed group and individual therapy, largely for substance abuse, which he participated in through 2007. (Tr. 705-30.)

In January 2008, the medical records seem to indicate that Copeland was brought into the emergency room by his fiancé for a possible drug overdose, but he was admitted and treated for approximately 21 days for acute kidney failure. (Tr. 835-84, 906-42.) While hospitalized, Copeland had a lumbar spine MRI, which showed that there were "mild degenerative changes with slightly narrowed L5-S1 disc space. [There was] no compression deformities."

(Tr. 933.)

In April 2008, Dr. Robbins administered a Mental Impairment Questionnaire (Tr. 426-31). There is a chart of 56 signs/symptoms, upon which Dr. Robbins checked 5 boxes: "blunt, flat or inappropriate affect; difficulty thinking or concentrating; paranoid thinking or inappropriate suspiciousness; emotional withdrawal or isolation; [and] sleep disturbance." (Tr. 427.) Additionally, Dr. Robbins found Copeland had "limited but satisfactory" ability to maintain regular attendance and be punctual within customary, usually strict tolerances, to carry out detailed instructions, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. (Tr. 428-29.) Additionally, Dr. Robbins thought Copeland's impairment would cause him to be absent from work more than 4 days per month. (Tr. 431.)

Dr. Alobeid also completed a Physical Residual Functional Capacity Questionnaire in April of 2008, however, there are no treatment notes from this physician in the record.[1] (Tr. 432-36.) He opined that, due to Copeland's depression, anxiety, back pain, and fatigue, he could only walk one block, sit for 30 minutes at a time, stand for only 10 minutes, and occasionally lift less than 10 pounds. (Tr. 433-34.) Dr. Alobeid also believed Copeland could

---

[1]It appears from the record that Dr. Alobeid was one of the physicians who saw Copeland while he was hospitalized for kidney failure. (Tr. 835-84, 906-42.)

stand and walk in combination for less than 2 hours in an 8-hour workday, that he would sometimes need unscheduled breaks, that he required a cane for standing or walking, and that he could rarely twist, stoop, crouch or squat. (Tr. 434-35.)

Copeland was in the hospital for approximately 5 days in August 2008. (Tr. 458.) At that time, he was irritable and angry, was not properly taking his medicine, and exhibited delusional thinking and paranoia. (Tr. 458-60, 466-67.)

By October 2008, therapy notes indicate that Copeland did not report depression or manic symptoms on his medication, and that he was staying busy around the house. (Tr. 502.) In January 2009, treatment notes indicate he "ha[d] been ok." (Tr. 503.) Copeland also reported no psychotic or manic symptoms, or depression. (Tr. 507.)

In June 2009, Copeland got into a physical altercation with his fiancé, and received inpatient care for anger management. (Tr. 469-76.) Copeland had not been taking his medications, and reported irritability and suicidal thoughts. (Tr. 470-76.) In August 2009, Copeland's therapist noted he had remained sober for nearly a year and a half, and complied with his medication, and attended group therapy once a week. (Tr. 486.)

Treatment notes in January 2010 indicate Copeland was doing well, with "no problems," and "compliant with meds no side effects." (Tr. 579.)

In March 2010, Dr. Robbins completed a second Mental Impairment Questionnaire. (Tr. 666-71.) He reported that Copeland's symptoms "are better controlled on current medication." (Tr. 666.) This time, Dr. Robbins checked boxes in the chart that Copeland was "unable to meet competitive standards" associated with semiskilled and skilled work, yet wrote in handwriting under that section, "unable to provide accurate assessment." (Tr. 669.) Additionally, Dr. Robbins checked boxes that Copeland was unable to meet competitive standards: to maintain attention for a two hour segment, to perform at a consistent pace without an unreasonable number and length of rest periods, to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and to be aware of normal hazards and take appropriate precautions. (Tr. 668.) He also opined that Copeland had marked difficulties with social functioning and maintaining concentration, persistence or pace and marked restrictions of activities of daily living; plus Copeland had experienced between one and three episodes of decompensation within a year, each of which lasted at least two weeks duration. (Tr. 670.) Dr. Robbins opined Copeland would likely miss work about 4 times per month, and that substance abuse contributed to his functional limitations. (Tr. 671.)

Copeland's Hearing Testimony

At the administrative hearing held on April 16, 2010, Copeland

stated that he lives with his fiancé and their five year old son, and has earned his GED. (Tr. 36.) He has a driver's license, and drives "when [he] can." (Tr. 36.) He is on Medicaid, and sees Dr. Robbins every 4 weeks, and goes to group therapy at Edgewater every Wednesday. (Tr. 37.) Copeland stated he is not currently working because "I keep getting fired." (Tr. 37.) He reported pain "[f]rom my neck down to my tailbone, all over my back. And then, my left foot hurts because I got run over by a paver." (Tr. 38.) Copeland testified that he has "a hard time because [his] medicine makes [him] tired." (Tr. 40.) Additionally, he said he could not "sit down too long because [his] back hurts, and then [he] can't stand up too long because [his] foot hurts." (Tr. 40.) He also reported difficulty sleeping, saying he sleeps "maybe a couple of hours at night, sometimes four hours." (Tr. 41.)

According to Copeland, his fiancé tells him when to shower, and reminds him to take his medicine, and to eat. (Tr. 42-43.) Copeland does play with his 5 year old son, for example, they will throw a ball, or play legos. (Tr. 42.) He can cook simple things, and does some light housework. (Tr. 42-43.) He likes to go fishing sometimes. (Tr. 44.)

Copeland reported hearing voices, but "[a]s long as I take my medicine, sometimes I don't hear them. But, if I don't take my medicine, I start hearing them, and they tell me to do things." (Tr. 44.) According to Copeland, he stays away from people most

days, "because I get in trouble." (Tr. 48.)

### Vocational Expert's Hearing Testimony

The ALJ asked the VE the following hypothetical question:

> Q: [l]et's assume an individual that's the same
> age, education, and work experience as the
> claimant, and has a residual functional capacity to
> perform a full range of work at all exertional
> levels. He can understand, remember, and carry out
> simple, routine facts [sic.]. He can concentrate,
> persist, and work on a sustained basis. He can
> interact appropriately with others but [INAUDIBLE]
> environment that is not highly social. He can
> tolerate ordinary job routines and changes. The
> claimant is able to perform any of his past
> relevant work, either as he actually performed the
> work or as [INAUDIBLE] customarily performed in the
> national economy?
>
> A. Yes, your honor. He could perform his past work
> as a construction laborer.
>
> Q. Are there any additional unskilled occupations
> this individual [INAUDIBLE] could perform?

(Tr. 52-53.) The VE answered yes, and said Copeland could be a
hand packager, feeder/offbearer, industrial cleaner (all with
medium exertion levels of an SVP of 2); and production assembler,
small parts assembler, and electronics worker (light work, with an
SVP of 2). (Tr. 54.)

The ALJ posed a second hypothetical question to the VE that
assumed Copeland's background, but with the following limitations:
limited but satisfactory abilities to maintain regular attendance
and be punctual within customary, usually strict tolerances; to
carry out detailed instructions; to maintain socially appropriate
behavior; and to adhere to basic standards of neatness and

cleanliness. (Tr. 55.) The VE answered that those changes would not prevent the individual from performing the aforementioned jobs.

In the third hypothetical, the ALJ directed the VE to Exhibit 23F (Dr. Robbins' second questionnaire), which outlined an individual who could not do the following: maintain attention for 2 hour segments, perform at a consistent pace without an unreasonable number and length of rest period, get along with coworkers and peers without completely distracting them or exhibiting behavioral extremes, participate in a routine work setting or be aware of normal hazards and take appropriate precautions, understand and remember detailed instructions, set realistic goals or make plans independently of others, and deal with the stress of semiskilled work. Also, the person in the hypothetical was seriously limited but not precluded from travel in unfamiliar places, including the use of public transportation, and would miss about 4 days per month from the work environment. (Tr. 55-56.) The VE responded that those limitations would preclude all unskilled occupations. (Tr. 56.)

Copeland's attorney then asked the VE to consider an RFC based on Exhibit 17F (Dr. Alobeid's questionnaire), an individual whose symptoms or pain frequently interfered with the attention and concentration needed to perform simple work tasks, who was incapable of tolerating a low stress job, who could sit for 30 minutes and stand for 10, who could stand and walk about 2 hours

11

out of 8, and who could lift less than 10 pounds occasionally. (Tr. 57.) The VE answered the individual would be precluded from being able to perform the jobs he mentioned. (Tr. 57.) If the individual additionally had a slower pace of 20% because of medication, they would also be precluded from performing any of the jobs. (Tr. 57.)

## Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.* Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB

or SSI benefits under the Social Security Act, the claimant must establish that he is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1: Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.

Step 2: Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to Step 3.

Step 3: Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to Step 4.

Step 4: Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to Step 5, where the burden of proof shifts to the Commissioner.

Step 5: Is the claimant able to perform any other work within his residual functional capacity in the national economy: If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); *see*

13

*also Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case, the ALJ found that Copeland suffers from the following severe impairments: depression, personality disorder, and substance addiction disorder. (Tr. 11.) The ALJ specifically found that Copeland's reported lower back pain did not qualify as a severe impairment, and resulted in only minimal functional limitations. (Tr. 11.)

The ALJ further found that Copeland did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926)). (Tr. 13). The ALJ then determined that Copeland has the residual functional capacity:

> [T]o perform a full range of work at all exertional levels, but with the following nonexertional limitations: he is limited to understanding, remembering, and carrying out simple, routine tasks. He can concentrate, and persist on a sustained basis. [He] can interact appropriately with others, but would do best in an environment that is not highly social. He can tolerate ordinary job routines and changes.

(Tr. 15.) Based on Copeland's RFC, the ALJ found that Copeland is capable of performing his past relevant work as a construction laborer. (Tr. 19.) Copeland believes that the ALJ committed several errors requiring reversal, which will be addressed in turn.


The Weight Given To Copeland's Treating Physicians

Copeland claims the ALJ erred in evaluating the opinions of

14

Copeland's two treating physicians, Drs. Robbins and Alobeid, and erroneously rejected them for reasons unsupported in the record. Social Security Ruling ("SSR") 96-2p provides that a treating physician's medical opinion must be given controlling weight if it is "well supported" and "not inconsistent with other substantial evidence in the case record." Furthermore, SSR 96-2p requires that the ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

If the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the ALJ must apply the following factors to determine the proper weight to give the opinion:

> (1) the length of the treatment relationship and frequency of examination;
>
> (2) the nature and extent of the treatment relationship;
>
> (3) how much supporting evidence is provided;
>
> (4) the consistency between the opinion and the record as a whole;
>
> (5) whether the treating physician is a specialist;
>
> (6) any other factors brought to the attention of the Commissioner.

20 C.F.R. §§ 404.1527(d)(2) and 416.927(a)-(d); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). It is reversible error for an ALJ to discount the medical opinion of a treating physician without applying this legal standard and for further failing to support the decision with substantial evidence. *Moss*, 555 F.3d at 561; *see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (finding the ALJ's rejection of a treating physician's mental residual functional capacity questionnaire was not substantially supported).

### Dr. Robbins

Copeland argues that the ALJ erred in giving no weight to Dr. Robbins' opinions, because the ALJ's reason for not accepting the opinion was not supported by the record. (DE #14, p. 8.) The parties do not dispute that Dr. Robbins specialized in psychiatry, and that he regularly treated Copeland from 2007 at least until the time of the administrative hearing. (Tr. 37.) Here, the ALJ specifically rejected the second Mental Impairment Questionnaire completed by Dr. Robbins in March 2010, after Dr. Robbins had treated Copeland for more than 2 years. (Tr. 666-71.) Dr. Robbins reported that Copeland's symptoms "are better controlled on current medication" (Tr. 666), but, compared to the first Mental Impairment Questionnaire completed by Dr. Robbins in April 2008 (Tr. 426-31), Dr. Robbins indicated many more problems associated with Copeland's

ability to work. For example, Dr. Robbins checked boxes in the chart that Copeland was "unable to meet competitive standards" associated with semiskilled and skilled work, yet wrote in handwriting under that section that he was "unable to provide accurate assessment." (Tr. 669.) Additionally, Dr. Robbins checked boxes that Copeland was unable to meet competitive standards with regards to maintaining attention for a two hour segment, performing at a consistent pace without an unreasonable number and length of rest periods, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and being aware of normal hazards and taking appropriate precautions. (Tr. 668.) He also opined that Copeland had marked difficulties with social functioning and maintaining concentration, persistence or pace and marked restrictions of activities of daily living. He further noted that Copeland had experienced between one and three episodes of decompensation within a year, each of at least two weeks duration. (Tr. 670.) Dr. Robbins opined Copeland would likely miss work about 4 times per month, and that substance abuse contributed to his functional limitations. (Tr. 671.)

The ALJ wrote in her opinion that:

Despite [Dr. Robbins'] statement that the claimant's impairments were better controlled on his current medications, Dr. Robbins this time indicated that the claimant was seriously limited, but not precluded from performing most mental work-related activities, while also adding that he was unable to meet competitive standards in areas such as maintaining attention, performing at a consistent pace, and getting along with co-workers and

17

peers. Dr. Robbins again commented however that he was "unable to provide an accurate assessment" of the claimant's limitations in these areas of functioning. **I do not give weight to either of Dr. Robbins' opinions (Exhibits 16F and 23F). His initial assessment was not entirely completed, and he added that he was unable to accurately assess the claimant's functionality in various areas of functioning.** In any event, Dr. Robbins believed that the claimant's ability to maintain regular attendance and be punctual within usual tolerances, to carry out detailed instructions, and to maintain socially appropriate behavior, was limited, but satisfactory, suggesting that he did not believe that the claimant was precluded from working altogether. **In his second assessment, Dr. Robbins indicated that the claimant's symptoms were better controlled while on medications, and yet he found far more severe functional limitations then he did in his first evaluation. He also again stated that he was "unable to provide an accurate assessment" of the claimant's limitations, further diminishing the efficacy of his opinions.**

(Tr. 18) (emphasis added).

Copeland argues that Dr. Robbins' notation under one section of the evaluation that he was "unable to provide accurate assessment," (which Dr. Robbins noted in both of the questionnaires), does not constitute a reason in the record to discount Dr. Robbins' opinions because he only noted this under one category – which was the "mental abilities and aptitudes needed to do semiskilled and skilled work." (Tr. 669.) In the second questionnaire, Dr. Robbins checked boxes in the chart that Copeland was "unable to meet competitive standards" associated with semiskilled and skilled work" yet wrote in handwriting under that section, "unable to provide accurate assessment." (Tr. 669.) He wrote that comment in one section of the questionnaire, stating to "Explain limitations falling in the three

18

most limited categories (identified by bold type) and include the medical/clinical findings that support this assessment." *Id*. Aside from Dr. Robbins' hand-written comment in one section of the questionnaire, Dr. Robbins does complete the rest of the questionnaires (although the first questionnaire contains a number of blanks, the second questionnaire is more thoroughly completed). The second reason the ALJ seems to have refused to give any weight to Dr. Robbins' opinions is that the ALJ believed it was inconsistent for Dr. Robbins to state in the second questionnaire that Copeland's symptoms were better controlled while on medications, and yet he found far more severe functional limitations than he did in the first questionnaire.

Even assuming, *arguendo*, that the ALJ offered "good reasons" to discount Dr. Robbins' opinion, she did not consider the checklist of factors required by the Social Security regulations in order to determine the appropriate weight to give Dr. Robbins' opinions. *Moss*, 555 F.3d at 561; *see also Bauer*, 532 F.3d at 608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors."). For example, the ALJ did not consider the length of the treatment relationship and frequency of examination, or the nature and extent of the treatment, or how much supporting

evidence was provided, and whether the treating physician is a specialist. 20 C.F.R. §§ 404.1527(c), 416.927(c). This alone requires remand. Moreover, the Court believes it was error to discount all of Dr. Robbins' opinions on the questionnaires when he wrote he could not provide an accurate assessment of explaining the limitations under just one category.

Dr. Alobeid

Copeland alleges the ALJ also erred in rejecting the opinion of Dr. Alobeid, another treating physician. Dr. Alobeid completed a Physical Residual Functional Capacity Questionnaire on July 18, 2008. (Tr. 432-36.) The following portion of the ALJ's decision deals with Dr. Alobeid:

> [Dr. Yaser Alobeid] not[ed] that the claimant suffered from back pain without radiculopathy, for which his prognosis was "good." Dr. Alobeid indicated that the claimant's experience of pain would frequently interfere with his attention and concentration, and that he was incapable of even "low stress" jobs. He also believed that the claimant could walk only one block without rest, could sit for 30 minutes at a time, stand for 10 minutes at a time, and stand or walk for less than 2 hours in an 8 hour work day. Dr. Alobeid further indicated that the claimant could occasionally lift less than 10 pounds, that he needed an assistive device while walking, and that he could rarely engage in any postural activities. I do not believe, based on the overall record, that the claimant's low back pain would reasonably result in such severe limitations. In general, there is minimal support for such extreme findings, and I therefore give Dr. Alobeid's assessment no weight.

(Tr. 12.)   The ALJ did note that after Dr. Alobeid made his assessment, an MRI dated June 26, 2008 (Tr. 651) revealed mild disc herniation at the L4-L5 level, and mild to moderate spinal stenosis at various levels, and a mild broad-based disc herniation at L3-L4. *Id.*

Again, an ALJ must give "good reasons" for discounting a treating doctor's medical opinion; if the opinion does not merit controlling weight, the ALJ must consider the checklist of factors set forth in § 1527(d).  *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).   The regulations required the ALJ to consider the length, nature, extent of the treatment, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.   20 C.F.R. § 416.927(d)(2); *see also Bauer*, 532 F.3d at 608.   The ALJ completely failed to undergo this analysis, but rather bluntly decided to give Dr. Alobeid's assessment "no weight."   (Tr. 12.) This also requires remand.


Credibility Determination

Copeland also claims that the ALJ failed to properly evaluate the credibility of his testimony.   Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong.   *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

However, when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005). Instead, the ALJ must make a credibility determination supported by record evidence and be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight given to the claimant's statements and the reasons for that weight. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

In evaluating the credibility of statements supporting a Social Security Application, the Seventh Circuit Court of Appeals has noted that an ALJ must comply with the requirements of Social Security Ruling 96-7p. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). This ruling requires ALJs to articulate "specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p. Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement including:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side

> effect of any medications the individual takes
> or has taken to alleviate pain or other
> symptoms;

> 5.   Treatment, other than medication, the
>       individual receives or has received for relief
>       of pain or other symptoms;

> 6.   Any measures other than treatment the
>       individual uses or has used to relieve pain or
>       other symptoms; and

> 7.   Any other factors concerning the individual's
>       functional limitations and restrictions due to
>       pain or other symptoms.

SSR 96-7p; *see also Golembiewski v. Barnhart*, 322 F.3d 912, 915-16

(7th Cir. 2003).

Here, the ALJ improperly used boilerplate language, without

articulating specific reasons, in assessing the credibility of

Copeland. In this case, she found:

> [T]he claimant's medically determinable impairments
> could reasonably be expected to cause the alleged
> symptoms; however, the claimant's statements
> concerning the intensity, persistence and limiting
> effects of these symptoms are not credible to the
> extent they are inconsistent with the above
> residual functional capacity assessment.

(Tr. 16.) This language fails to specify which statements are

credible, thus there is no basis to review whether the ALJ's

conclusion is supported by substantial evidence. Almost identical

boilerplate language was used in *Bjornson v. Astrue*, 671 F.3d 640

(7th Cir. 2012). There, the Seventh Circuit noted:

> One problem with the boilerplate is that the
> assessment of the claimant's "residual functional
> capacity" (the bureaucratic term for ability to
> work) comes later in the administrative law judge's

opinion, not "above" – above is just the foreshadowed conclusion of that later assessment. A deeper problem is that the assessment of a claimant's ability to work will often . . . depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.

*Id.* at 645.

Because this case must be remanded so the treating physician's opinions may be properly assessed and the credibility of Copeland properly addressed, this Court specifically declines to rule on the other arguments submitted by Copeland as to why the ALJ's decision was incorrect.


CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).



DATED: July 3, 2012                    /s/ **RUDY LOZANO, Judge**
                                       **United States District Court**